**OKIN HOLLANDER LLC**
Paul S. Hollander (PH2681)
Margreta M. Morgulas (MM7441)
Glenpointe Centre West, 2nd Floor
500 Frank W. Burr Blvd., Suite 40
Teaneck, NJ  07666
Tel:     (201) 947-7500
phollander@okinhollander.com
mmorgulas@okinhollander.com
Attorneys for Plaintiff Robert J. Longo

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Robert J. Longo,<br><br>                              Plaintiff,<br><br>v.<br><br>Environmental Protection &<br>Improvement Company, Inc.,<br><br>                              Defendant. | Civil Action No.:        16-cv-9114<br><br>**COMPLAINT**<br><br>*JURY TRIAL REQUESTED* |

Plaintiff Robert J. Longo complains and alleges against Defendant Environmental

Protection Improvement Company, Inc., as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Robert J. Longo ("**Plaintiff**" or "**Longo**") is a resident of the Commonwealth of

Puerto Rico with an address at 1000 El Conquistador Avenue, Casita 5061, Fajardo, Puerto Rico,

and is deemed to be a citizen of the Commonwealth of Puerto Rico pursuant to 28 U.S.C. 1332.

2.      Environmental Protection & Improvement Company, Inc., f/k/a R.J. Longo

Construction Co., Inc. ("**Defendant EPIC**" or "**EPIC**"), is a New Jersey corporation, with a

principal place of business at 227 Route 206, Flanders, New Jersey 07836, and is deemed to be a

citizen of the State of New Jersey pursuant to 28 U.S.C. § 1332.

3.      The matter in controversy in this action exceeds $75,000, exclusive of interests and costs.

4.      Jurisdiction in this Court is based upon 28 U.S.C. § 1332, as this is an action between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the applicable statutory requirement.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 for the reasons that Defendant EPIC resides within this judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## FACTS

### R.J. Longo Construction Company, Inc, d/b/a EPIC

6.      In or around 1971, R.J. Longo Construction Company, Inc, a New Jersey corporation ("**RJLCC**"), was formed by Longo generally for the purpose of performing governmental contracts pertaining to sewage and water distribution, transportation and treatment.

7.      In or around, 1989, R.J. Longo Construction Company, Inc. began being operated as R.J. Longo Construction Company, Inc., d/b/a EPIC (as previously defined, "**EPIC**").

8.      In or around July 1997, Longo transferred fifty percent (50%) of the issued and outstanding shares of RJLCC, which was previously wholly-owned by Longo, to The Robert J. and Andrea Longo Charitable Trust, a charitable trust settled by Longo and his spouse under the laws of the State of New Jersey.

### 1990 EPIC-PVSC Services Agreement

9.      In or around 1990, EPIC entered into a services agreement ("**EPIC/PVSC Agreement**") with the Passaic Valley Sewerage Commissioners (the "**PVSC**"), which services agreement was subsequently terminated by the PVSC in 1996.

**1996 Wheelabrator-PVSC Services Agreement**

10.     In or around 1993, the PVSC published a Request for Qualifications pursuant to which the PVSC solicited Statements of Qualifications from companies with the necessary resources to provide comprehensive sludge management services for the PVSC.

11.     Thereafter, the PVSC purported to comply with the procurement process mandated by the New Jersey Wastewater Treatment Privatization Act, N.J.S.A. 58-27-1, et seq., after which the PVSC entered into, on or about August 22, 1996, that certain "Service Agreement: Comprehensive Sludge Management Services between Passaic Valley Sewerage Commission and Wheelabrator Clean Water New Jersey Inc." (the "**PVSC Services Agreement**"), with Wheelabrator Clean Water New Jersey, Inc. ("**WCWNJ**"), n/k/a Synagro-WCWNJ, LLC ("**Synagro-WCWNJ**").  A true and correct copy of the PVSC Services Agreement is annexed hereto as Exhibit "A".

12.     The EPIC/PVSC Agreement terminated immediately prior to the effective date of the PVSC Services Agreement.

13.     Since its inception, the PVSC Services Agreement has remained in ***continuous*** force and effect as a result of the following amendments thereto: (i) Amendment to Service Agreement dated August 10, 2000 (the "**First PVSC Services Agreement Amendment**"), a true and correct copy of which is annexed hereto as Exhibit "A-1"; (ii) Second Amendment to Service Agreement dated December 11, 2002 (the "**Second PVSC Services Agreement Amendment**"), a true and correct copy of which is annexed hereto as Exhibit "A-2"; (iii) Third Amendment to Service Agreement dated June 20, 2006 (the "**Third PVSC Services Agreement Amendment**"),

3

a true and correct copy of which is annexed hereto as Exhibit "A-3"; and (iv) Fourth Amendment to Service Agreement dated August 11, 2016 (the "**Fourth PVSC Services Agreement Amendment**"), a true and correct copy of which is annexed hereto as Exhibit "A-4".

14.     Most recently, pursuant to the Fourth PVSC Services Agreement Amendment, the PVSC Services Agreement was renewed and extended by the PVSC for an initial period of five (5) years from August 31, 2016 to August 31, 2021; subject to PVSC's sole option to further extend the PVSC Services Agreement for three (3) additional terms of five (5) years (*i.e.,* potentially through August 31, 2036).

### PVSC Services Agreement Litigation

15.     In August 1994, EPIC filed suit in the Superior Court of New Jersey, Essex County ("**PVSC Services Agreement Litigation**"), against, *inter alia*, the PVSC, which suit was subsequently amended to include, among others, WCWNJ as a defendant.

16.     The PVSC Services Agreement Litigation was subsequently removed by certain of the defendants thereto to the United States District Court for the District of New Jersey ("**NJ District Court**"), which removed action was styled *R.J. Longo Construction Co., Inc., d/b/a EPIC v. Passaic Valley Sewerage Commission, et. al.*, 94-cv-04795 (D.Ct. NJ Sept. 30, 1994).

17.     The NJ District Court entered a judgment in the PVSC Services Agreement Litigation in or around March 1998, which judgment was ultimately appealed ("**PVSC Services Agreement Litigation Appeal,**" and, together with the PVSC Services Agreement Litigation, the "**Settled PVSC Services Agreement Litigation**"), by the plaintiff to the United States Court of Appeals for the Third Circuit.

### Purchase Of Stock/Assets Of EPIC By CAHC

18.     In or around February 1997, and during the pendency of the Settled PVSC Services Agreement Litigation, the then-current owners of EPIC contracted, pursuant to Stock Purchase Agreements (collectively, the "**EPIC/CAHC Stock Purchase Agreements**"), to sell all of the issued and outstanding shares of corporate stock (and certain related assets) of EPIC to Compost America Holding Company, Inc. ("**CAHC**").

19.     The EPIC/CAHC Stock Purchase Agreements explicitly omitted from the purchase and sale transaction certain assets (as defined therein and delineated on the Schedules thereto collectively as the "**Excluded Assets**"), which Excluded Assets included, *inter alia*, various litigation by and against EPIC (collectively, the "**Excluded Litigation**").

20.     Potentially relevant to this action, the Excluded Litigation included, among others, the Settled PVSC Services Agreement Litigation.

21.     Pursuant to that certain "Assignment, Assumption and Indemnity Agreement Regarding Litigation," dated as of November 3, 1997, ("**EPIC Assignment Agreement**"), EPIC assigned to Longo all of EPIC's right title and interest with respect to the Excluded Litigation, including, any claims and causes of action that were or could have been the subject matter of such Excluded Litigation, such as the Settled PVSC Services Agreement Litigation.

**Resolution of Settled PVSC Services Agreement Litigation**

22.     During the pendency of the Settled PVSC Services Agreement Litigation, in or around February 1999, the claims and causes of action asserted by EPIC (the rights to which were owned by Longo under the EPIC Assignment Agreement), in the Settled PVSC Services Agreement Litigation were resolved by a negotiated settlement by and between the then-remaining parties.

23.     In order to effectuate the terms and conditions of the mutually-agreed upon settlement, certain of the parties, as identified below, entered into, on or around February 19, 1999, the following (collectively, the "**1999 Agreements**"):

a.     Articles of Agreement between EPIC, on the one hand, and Wheelabrator Water Technologies, Inc., BioGro Division, and WCWNJ, on the other hand, dated February 18, 1999 ("**Articles of Agreement**").  A true and correct copy of which is annexed hereto as Exhibit "B";

b.     Sludge Transportation Services Agreement between EPIC and Synagro-WCWNJ dated February 18, 1999 (the "**Transportation Services Agreement**"), pursuant to which EPIC agreed, as a subcontractor of Synagro-WCWNJ, to provide those transportation and related services for the PVSC on the terms and conditions contained in the PVSC Services Agreement.  A true and correct copy of which Transportation Services Agreement is annexed hereto as Exhibit "C";

c.     Agreement ("**Earn Out Agreement**") between Longo and EPIC (which, pursuant to the EPIC/CAHC Stock Purchase Agreements, was then wholly-owned by CAHC), pursuant to which EPIC, *inter alia*, agreed to cause to be paid to Longo those amounts delineated therein.  A true and correct copy of the Earn Out Agreement is annexed hereto as Exhibit "D"; and

d.     Security Agreement between Longo and EPIC dated on February 18, 1999 (as subsequently amended, the "**Security Agreement**"), pursuant to which EPIC (which, pursuant to the EPIC/CAHC Stock Purchase Agreements, was then wholly-owned by CAHC), granted, assigned, pledged, transferred and delivered to Longo a valid, first lien on and security interest in all of EPIC's right, title and interest in and to certain collateral, including, but in no way limited to: (a) the Articles of Agreement, and (b) the Transportation Services Agreement (collectively and

as defined in the Security Agreement, the "**Collateral**").  A true and correct copy of the Security Agreement is annexed hereto as Exhibit "E".

<strong>Terms And Conditions Of 1999 Agreements</strong>

**A.     Acknowledgement Of Adequate Consideration And Enforceability**

24.     Relevant to the instant litigation, the preambles to the Earn Out Agreement iterate the instrumental role that Longo played in the "negotiation, execution and delivery of the Articles of Agreement, the Transportation Services Agreement…," and explicitly recognize the "significant value and revenue to EPIC which is a direct result of Longo's efforts prior to the date hereof…."  Exhibit D at pp. 2-4.

**B.     The 1999 Agreements Explicitly Provide That Each Shall Remain In Force And Effect For The Stated Terms Thereof, As May Be Extended And Renewed**

25.     Each of the 1999 Agreements contains terms and conditions making it plain that each shall continue to be in force and effect so long as *any* of the underlying public solid waste contracts and services agreements, of which the PVSC Services Agreement was one, remain in force and effect.

26.     Relevant to the instant litigation, Section 6.5 of the Articles of Agreement provides, in pertinent part, as follows:

> In the event ***any*** of the public solid waste contracts referenced hereinabove are ***extended in duration***, this Agreement shall continue to apply with respect to such ***extended period of performance*** to the ***same extent*** as if such period had been ***part of the original contract*** between such public entity and the contracting party.

Exhibit B at pp. 16-17 (emphasis added).  In other words, the parties agreed that the Articles of Agreement would remain in force and effect for the same term as the PVSC Services Agreement, as it may be renewed and extended.

27.     Further, also relevant to the instant litigation, Section 6 of the Transportation Services Agreement provides, in pertinent part, as follows:

> 6.     PERIOD OF PERFORMANCE
> The term of this Transportation Services Agreement shall commence no later than thirty (30) days from the date of execution by all parties.  This Transportation Services Agreement **will terminate on the same date that [the PVSC Services Agreement] terminates.  In the event that the [PVSC Services Agreement] is extended in duration, this Transportation Services Agreement shall continue to apply with respect to such extended period of performance to the same extent as if such period had been part of the original [PVSC Services Agreement]**.

Exhibit C at p. 18 (emphasis added).  As with the Articles of Agreement, the Transportation Services Agreement reflects the plain intention of the parties that it will remain in force and effect for so long as the PVSC Services Agreement remains in force and effect, including through renewals and extensions thereof.

28.     The terms of the Earn Out Agreement and the Security Agreement are inextricably interconnected and co-terminus with the term of the Articles of Agreement and/or the Transportation Services Agreement.

29.     Section 1 of the Earn Out Agreement provides, in pertinent part, that any and all components of the Earn Out Consideration (as defined in Section 3) shall be due and owing to Longo for so long as the Articles of Agreement and/or the Transportation Services Agreement shall remain in force and effect, including, without limitation "during the term of either such agreements and **any renewals** thereof".  Exhibit D, Section 1, at p. 3 (emphasis added); *see also, Id*. at pp. 4-6.

## C.     Amounts EPIC Is Required To Pay Longo Under The Earn Out Agreement

30.     As previously stated, pursuant to the Articles of Agreement and the Transportation Services Agreement, EPIC agreed, as a subcontractor of WCWNJ, to provide those transportation

and related services for the PVSC on the terms and conditions contained in the Articles of Agreement and the Transportation Services Agreement.

31.     EPIC, in turn, is required, by the Earn Out Agreement, to pay to Longo all or a portion of the amounts paid to EPIC by WCWNJ on account of the provision of transportation and related services to the PVSC under the Articles of Agreement and the Transportation Services Agreement.  As a result, it is not surprising that the terms and conditions delineated in the Articles of Agreement and Transportation Services Agreement with respect to the calculation of the amounts to be paid to EPIC by WCWNJ on account of EPIC's provision of transportation and related services to the PVSC are substantively the same as the terms and conditions delineated in the Earn Out Agreement with respect to the calculation of the amounts to be paid to Longo by EPIC.  *Compare* Exhibit B at pp. 2-13 and Exhibit C at Exhibit A thereto with Exhibit D at pp. 3-6.

32.     Section 1 of the Earn Out Agreement provides that EPIC is required to pay Longo the amounts delineated therein (collectively, as defined in Section 3 of the Earn Out Agreement, the "**Earn Out Consideration**"), which include, *inter alia*:

   a.     *PVSC Per Ton Earn Out Consideration* (Section 1(a) of the Earn Out Agreement).  Section 1(a) of the Earn Out Agreement provides, in part, that, in accordance with the PVSC Services Agreement, WCWNJ:

> …agreed to transport sludge materials for PVSC to ***certain designated sites in Virginia or, at its option, to sites outside the State of Virginia***.  In accordance with the Articles of Agreement, EPIC has agreed with [WCWNJ] to transport the sludge to the designated sites in Virginia at a price of Thirty Five ($35.00) Dollars per ton.  Upon the effectiveness of the Articles of Agreement and the Transportation Services Agreement, or any contract in replacement or substitution for either of them, entered into by EPIC, its parent, affiliates, successors or assigns, Longo shall be entitled to receive an amount (the "**PVSC Per Ton Earn Out Consideration**") which is equal to Three ($3.00) Dollars per ton for each ton of sludge

transported by EPIC, or its parent, affiliates, successors or assigns to the designated Virginia sites pursuant to the Articles of Agreement and/or the Transportation Services Agreement, during the term of either of such agreements and any renewals thereof.

Exhibit D at Section 1(a), pp. 3-4 (emphasis added).  In short, the PVSC Per Ton Earn Out Consideration was, as ratified by EPIC's course of performance under the Earn Out Agreement, intended to compensate Longo for any PVSC-generated sludge materials transported by EPIC to sites within or without the Commonwealth of Virginia throughout the term of the PVSC Services Agreement.

b.      *Diversion Fee* (Section 1(b) of the Earn Out Agreement).  Section 1(b) of the Earn Out Agreement provides, in part, that under the PVSC Services Agreement, WCWNJ has the option to transport:

> …a portion of the sludge materials **to sites outside the State of Virginia**. To the extent that [WCWNJ] elects to transport any of the PVSC sludge materials to sites outside the State of Virginia, EPIC shall have a right of first refusal, in accordance with the Articles of Agreement, to provide transportation of the PVSC sludge to such other sites, on terms and conditions to be negotiated by the parties.  **If the parties cannot agree on the terms of such transportation services**, [WCWNJ] may solicit bids for such transportation and request that EPIC match the lowest and best bid for such services.  **If EPIC will not match the lowest and best bid for such services,** [WCWNJ] may contract for transportation services on the basis of such lowest and best bid, **whereupon EPIC shall be entitled to** a diversion fee (the "**Diversion Fee**") of Three ($3.00) Dollars per ton for **each ton of PVSC sludge materials which will not be transported by EPIC and Longo shall be entitled to receive all of any such Diversion Fee to which EPIC is entitled in connection therewith**.

Exhibit D at pp. 4-5 (emphasis added).  With respect to Section 1(b) of the Earn Out Agreement, it has been agreed by and between EPIC and Longo on several occasions (and thereby ratified by all parties thereto) that the Diversion Fee is not the sole means of compensating Longo in the event that PVSC-generated sludge materials were transported to sites outside of the Commonwealth of Virginia.  Rather, the Diversion Fee was intended solely to compensate Longo *if and only if*:(a)

10

*WCWNJ* made the election to transport such materials to sites outside the Commonwealth of Virginia, and (b) EPIC did *not* perform the transportation services; it being agreed that if EPIC performed such transportation services, Longo was entitled to, *inter alia*, the PVSC Per Ton Earn Out Consideration.

   c. *PVSC Increased Fee* (Section 1(d) of the Earn Out Agreement).  Section 1(d) of the Earn Out Agreement provides that:

> If any fees provided for in the Articles of Agreement or the Transportation Services Agreement are increased in accordance with either of such agreements, ***EPIC shall be entitled to receive its proportionate share of any such increase*** as provided in the Articles of Agreement and ***Longo shall be entitled to receive his proportionate share of any such increased fee received by EPIC*** (the "**PVSC Increased Fee**").

Exhibit D at p. 5 (emphasis added).  The PVSC Increased Fee is intended to ensure that as the amounts paid to EPIC under the Articles of Agreement and Transportation Services escalated no less than annually (*e.g.,* as provided for in Article 5 of the Articles of Agreement) throughout the term of and pursuant to the PVSC Services Agreement, Longo would receive his proportionate share of such escalations under the Earn Out Agreement.

   d. *Additional Fee* (Section 1(e) of the Earn Out Agreement).  Section 1(e) of the Earn Out Agreement provides:

> In the event that pursuant to the PVSC Agreement, [WCWNJ] agrees to transport additional sludge for PVSC, other than that currently provided for under the PVSC Agreement, EPIC shall have a right of first refusal, in accordance with the Articles of Agreement to provide transportation of such additional sludge, on terms and conditions to be negotiated by the parties. If the parties cannot agree on the terms of such transportation services, [WCWNJ] may solicit bids for such transportation and request that EPIC match the lowest and best bid for such services. ***If EPIC will not match the lowest and best bid*** for such services, [WCWNJ] may contract for transportation services on the basis of such lowest and best bid, but ***in such event EPIC shall not be entitled to a Diversion Fee*** in connection therewith. If [WCWNJ] and EPIC agree on the terms of such transportation services, ***Longo shall be entitled to receive Three ($3.00) Dollars per ton***

for each ton of sludge transported by EPIC, or its parent, affiliates, successors or assigns in connection therewith (the "**Additional Fee**").

Exhibit D at pp. 5-6 (emphasis added).   The Additional Fee provided for under Section 1(e) is intended to govern the calculation of the amounts owed to Longo in the event that: (i) PVSC effects a modification to the PVSC Services Agreement or executes a change order as permitted by Article 19 of the PVSC Services Agreement pursuant to which the PVSC requests transportation of additional PVSC-generated sludge materials, and (ii) EPIC agrees to provide such transportation and related services.

**D.     Restraints On Modification, Amendment And/Or Termination Of The 1999 Agreements Without Longo's Prior Written Consent**

33.     Section 5 of the Earn Out Agreement explicitly provides, in relevant part, that EPIC is required to use its best efforts with respect to the execution, delivery and performance under the Articles of Agreement and the Transportation Services Agreement, and that EPIC shall ***not:***

> …sell, assign, abandon, ***modify, amend or terminate the Articles of Agreement [or] the Transportation Services Agreement***…without Longo's ***express prior written consent***. EPIC will consult with Longo on all matters which could reasonably be expected to have a material adverse effect on Longo's ability to earn all or any portion of the Earn Out Consideration and shall not take any such action, ***without Longo's express written consent***.

Exhibit D at p. 9 (emphasis added); *see, also,* Exhibit E at pp. 6-7.

34.     Section 5 of the Security Agreement provides, in relevant part, that EPIC shall ***not***:

> …***amend, modify, terminate or waive*** any provision of the Articles of Agreement, the Transportation Services Agreement……or consent to any departure from any provisions of such agreements ***without the prior written consent of Longo, nor shall EPIC permit to occur any default*** which, if not cured or waived within any applicable grace period, ***would authorize Wheelabrator to terminate the Articles of Agreement or the Transportation Services Agreement*** ….

Exhibit E at p. 6 (emphasis added).

12

35.     In sum, the Earn Out Agreement and Security Agreement prevent EPIC (or, pursuant to Section 15 of the Security Agreement and Section 11 of the Earn Out Agreement, any administrators, successors and assigns thereof) from taking any action that would materially alter Longo's rights under the 1999 Agreements without the prior written consent of Longo.

36.     Longo has never been asked by, nor has he otherwise given written consent to, EPIC (or any successors or assigns thereof), to modify any of the terms and conditions of or take any action with respect to any of the 1999 Agreements or the PVSC Services Agreement that would affect his rights under the Earn Out Agreement and the Security Agreement.  Indeed, the only temporary concession or temporary amendment agreed to by Longo under the Earn Out Agreement pertained solely to the Earn Out Consideration owed by EPIC to Longo thereunder and on account of the EnCAP Agreement (as hereinafter defined).  *See, infra*, paragraphs 57-66.

**E.     EPIC Is Required To Hold All Amounts Due And Owing To Longo Under The Earn Out Agreement In Segregated Accounts And In Trust For Longo**

37.     Section 1(f) of the Earn Out Agreement explicitly provides that EPIC is required to hold any and all amounts received by EPIC and due and owing to Longo under the Earn Out Agreement "***in trust for the benefit of Longo***…," and that all such amounts "***shall be segregated from other funds of EPIC and shall be delivered by EPIC to Longo***…", in accordance with the terms and conditions of the Earn Out Agreement.  Exhibit D at p. 6 (emphasis added).

**F.     Indemnification Obligations Under Security Agreement**

38.     The Security Agreement requires EPIC to both indemnify and hold Longo harmless from any claims and losses and the like under the Earn Out Agreement and/or the Security Agreement as well as to pay, on demand, any and all amounts incurred by Longo in connection with the exercise and enforcement of Longo's rights under the Earn Out Agreement and/or the Security Agreement.  *See* Exhibit E at pp. 3-4.

39.     Section 2 of the Security Agreement provides, in pertinent part, that the Collateral shall secure all obligations due and owing by EPIC to Longo under the operative agreements, including, but not limited to:

> … any and all expenses, which may be incurred by Longo in collecting any of the Obligations or enforcing any rights under the Earn Out Agreement or this Security Agreement.

Exhibit E at pp. 3-4.

40.     Moreover, Section 12 of the Security Agreement specifically provides that:

(a)     EPIC agrees to ***indemnify and hold harmless*** Longo and his agents, employees, representatives, accountants and attorneys from and against any losses, liabilities, damages, settlement payments, obligations, or claims, actions or causes of action and ***reasonable costs and expenses incurred, suffered, sustained or required to be paid (including the reasonable fees and out-of-pocket expenses of counsel to Longo) incurred by or asserted against Longo in investigating, preparing for, defending against, or providing evidence, producing documents or taking any other action in respect of any commenced or threatened litigation, administrative proceeding or investigation by reason of, relating to, arising out of, resulting from, or in any way connected with the Earn Out Agreement, the Articles of Agreement, the Transportation Services Agreement…or this Security Agreement or the transactions contemplated hereby or thereby*** or which otherwise arise in connection herewith or therewith, or on account of any act or omission to act by Longo in connection with this Security Agreement, unless cause by Longo's gross negligence or willful misconduct. ***This indemnity set forth herein shall be in addition to any other obligations or liabilities of EPIC to Longo*** hereunder, under the Earn Out Agreement, the Articles of Agreement, the Transportation Services Agreement…or at common law to otherwise, and shall survive the termination of this Security Agreement and the payment of all indebtedness of EPIC to Longo under the Earn Out Agreement, provided that EPIC shall not have any obligation under this Section 12 to Longo with respect to any of the foregoing arising out of Longo's gross negligence or willful misconduct.   In any investigation, proceeding or litigation, or the preparation therefor, Longo shall be entitled to select his own counsel.

(b) EPIC will ***upon demand*** pay to Longo, as the case may be, the amount of any and all reasonable expenses, including the reasonable fees and disbursements of his counsel and of any experts and agents, which Longo may incur in connection with (i) the administration of the Earn Out

Agreement (except as specifically provided therein) of this Security Agreement, (ii) the custody, preservation, use or operations of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the lawful exercise or enforcement or any of Longo's rights hereunder or under the Earn Out Agreement or (iv) the failure by EPIC to perform or observe any of the provisions hereof or thereof.

Exhibit E at pp. 14-15 (emphasis added).

### Purchase Of Stock/Assets Of EPIC By Synagro From CAHC; Amendment of Security Agreement

41.     On or about March 31, 2000, Synagro Technologies, Inc. ("**Synagro**"), contracted, pursuant to a stock purchase agreement with the then-owners of EPIC, to purchase all of the issued and outstanding shares of corporate stock of EPIC (and certain related assets) (the "**EPIC/Synagro Stock Purchase Agreement**").

42.     The EPIC/Synagro Stock Purchase Agreement explicitly identified both the Earn Out Agreement and the Security Agreement as binding and enforceable agreements to which EPIC was (and would continue to be) a party after the closing called for in the EPIC/Synagro Stock Purchase Agreement.

43.     In connection with Synagro's purchase of EPIC from CAHC, on or about June 15, 2000, Longo and EPIC entered into an "Amendment to Security Agreement," pursuant to which certain provisions of the Security Agreement were amended and restated ("**Amended Security Agreement**").  A true and correct copy of which Amended Security Agreement is annexed hereto as Exhibit "E-1".

44.     None of the provisions relied upon herein regarding the Security Agreement were materially altered by the Amended Security Agreement.

**Purchase Of Stock/Assets of WCWNJ By Synagro**

45.     Based upon information and belief, in or around the August 2000 execution of the Second PVSC Services Agreement Amendment, Synagro purchased all of the issued and outstanding shares and/or assets of, *inter alia*, WCWNJ, and, in connection (as previously indicated herein above), changed the corporate name of WCWNJ to Synagro-WCWNJ.

46.     Accordingly, by no later than September 2000, Synagro owned all of the issued and outstanding shares of both EPIC and WCWNJ.

**EPIC's Course of Performance Under Earn Out Agreement**

47.     As a general matter, EPIC performed, at least in part, its obligations to Longo under the Earn Out Agreement from March 1999 through and including August 2016, the scheduled termination date of the PVSC Services Agreement as amended by the Third PVSC Services Agreement Amendment and prior to the execution of the Fourth PVSC Services Agreement Amendment (which Fourth PVSC Services Agreement Amendment renewed and further extended the term of the PVSC Services Agreement).

48.     Throughout that same period, EPIC raised, on at least four (4) separate occasions, alleged objections to the continued applicability and/or enforceability of the Earn Out Agreement. As delineated herein below, with the exception of the most recent challenge by EPIC in August 2016, the alleged objections were mutually-resolved by the parties as a result of EPIC's recognition of the continued viability of the Earn Out Agreement and as a result of Longo's reliance on the representations of EPIC that EPIC had, to date, paid all amounts due and owing to Longo under the relevant agreements.

49.     Importantly, at no point prior to October 2016, *see* paragraphs 84-90 *infra*, did any representative or agent of Synagro (or any of its affiliated entities, including EPIC), allege that the

Earn Out Agreement and/or any of the other 1999 Agreements had been terminated by agreement of the parties thereto or as a result of the purchase by Synagro of all of the outstanding stock and/or assets of both WCWNJ and EPIC.

**A.     Resolution Of Alleged Disputes In June 2002**

50.     In or around June 2002, Longo was contacted by Mr. Alvin Thomas ("**Thomas**"), then General Counsel of Synagro and related entities, including EPIC, who requested that Longo meet to discuss the continuing obligations of EPIC to Longo under the 1999 Agreements.

51.     The primary issue raised by Thomas centered on PVSC's alleged re-direction of PVSC-generated sludge materials to sites within the State of New Jersey designated by the Hackensack Meadowlands Development Commission, n/k/a the New Jersey Meadowlands Commission (collectively, the "**HDMC Sites**").

52.     Specifically, Thomas and other officers/directors of Synagro and related entities, including EPIC, contended that EPIC had no obligation to pay any portion of the Earn Out Consideration to Longo under the Earn Out Agreement if EPIC was, pursuant to the PVSC Services Agreement, requested to transport PVSC-generated sludge materials to sites outside the Commonwealth of Virginia, including, without limitation, to the HDMC Sties (which HDMC Sites were, as previously indicated, within the State of New Jersey).

53.     Ultimately, Longo and Thomas agreed that, *inter alia*, Sections 1 and 3 of the Earn Out Agreement obligated EPIC to pay Longo: (x) the PVSC Per Ton Earn Out Consideration defined in and required by Section 1(a) of the Earn Out Agreement (together with any PVSC Increased Fee required under Section 1(d) of the Earn Out Agreement), on account of any PVSC-generated sludge materials transported by EPIC within or without the Commonwealth of Virginia, including, without limitation, to the HDMC Sites in the State of New Jersey; (y) the Diversion Fee

defined in and required by Section 1(b) of the Earn Out Agreement in the event that WCWNJ elected to transport PVSC-generated sludge materials to sites outside of the Commonwealth of Virginia and such materials are transported by an entity other than EPIC; and/or (z) the Additional Fee defined in and required by Section 1(e) of the Earn Out Agreement in the event that WCWNJ agreed to transport "additional sludge" not provided for under the PVSC Services Agreement (*i.e.,* transportation and related services added pursuant to modifications of or change orders with respect to the PVSC Services Agreement).

54.     During the course of the discussions between Thomas and Longo in and around June 2002, it was represented and demonstrated, through the provision of cost-related models prepared by Synagro and/or EPIC and delivered to Longo, that the fees charged to the PVSC by EPIC (through Synagro-WCWNJ) for the transportation of all PVSC-generated sludge materials included (*i.e.,* built in) the payment by EPIC to Longo of the Earn Out Consideration.

55.     As a result of the discussions with and a review of the models and other information provided to Longo by officers and directors of Synagro and related entities (including EPIC), it was reasonable for Longo to assume that EPIC was performing all of the transportation services with respect to all PVSC-generated sludge materials transported to sites within and without the Commonwealth of Virginia.

56.     From June 2002 through June 2004, EPIC paid Longo those amounts that EPIC contended constituted all amounts due and owing to Longo under the Earn Out Agreement.

**B.     Resolution Of Alleged Disputes In August 2004**

57.     In August 2004, Longo's review of the then most recent payments received by him from EPIC under the Earn Out Agreement led Longo to believe that he was not being paid the full

amount of the Earn Out Consideration due and owing to him by EPIC under the Earn Out Agreement.

58.   By letter dated August 30, 2004, counsel to Longo interposed a formal Earn Out Objection (as defined in and governed by Section 7 of the Earn Out Agreement) to EPIC, which Earn Out Objection challenged the calculation of the PVSC Per Ton Earn Out Consideration paid by EPIC to Longo for, at a minimum, the month of July 2004.

59.   Specifically, the 2004 dispute related to an agreement by and between the PVSC and EnCAP Golf Holdings, LLC ("**EnCAP**"), dated on or about July 10, 2002 ("**EnCAP Agreement**"), which resulted in the diversion and transportation of PVSC-generated sludge materials to the project sites designated by EnCAP in the State of New Jersey (*i.e.,* sites outside of the Commonwealth of Virginia, collectively, the "**EnCAP Sites**").

60.    From approximately August through November 2004, the parties held meetings and exchanged correspondence regarding the alleged dispute.

61.   Ultimately, as in 2002, officers and directors of Synagro and related entities, including EPIC, acknowledged the continuing enforceability of the Earn Out Agreement, including EPIC's obligation to pay Longo: (x) the PVSC Per Ton Earn Out Consideration defined in and required by Section 1(a) of the Earn Out Agreement (together with any PVSC Increased Fee required under Section 1(d) of the Earn Out Agreement), on account of any PVSC-generated sludge materials transported by EPIC within or without the Commonwealth of Virginia, including, but not limited to, materials transported by EPIC to the EnCAP Sites in the State of New Jersey; (y) the Diversion Fee defined in and required by Section 1(b) of the Earn Out Agreement in the event that WCWNJ elected to transport PVSC-generated sludge materials to sites outside of the Commonwealth of Virginia and such materials are transported by an entity other than EPIC; and/or

(z) the Additional Fee defined in and required by Section 1(e) of the Earn Out Agreement in the event that WCWNJ agreed to transport "additional sludge" not provided for under the PVSC Services Agreement (*i.e.,* transportation and related services added pursuant to modifications of or change orders with respect to the PVSC Services Agreement).

62.     In other words, officers and directors of Synagro and related entities, including EPIC, once again ratified (as they had in 2002), the applicability and/or enforceability of Section 1 of the Earn Out Agreement as it pertained to EPIC's obligation to pay Longo Earn Out Consideration for PVSC-generated sludge materials transported within or without the Commonwealth of Virginia, including to the EnCAP Sites in the State of New Jersey.

63.     However, after acknowledging the continued enforceability of the Earn Out Agreement and its applicability to PVSC-generated sludge materials transported by EPIC to EnCAP Sites in the State of New Jersey, EPIC argued that the payment of the amounts due under Section 1 of the Earn Out Agreement to Longo would result in an "undue" economic burden on EPIC.

64.     Specifically, EPIC alleged that the decreased gross profit (a result of an allegedly agreed-upon reduction by Synagro-WCWNJ and the PVSC, which was done without the knowledge of or written approval by Longo) with respect to EPIC's transportation of PVSC-generated sludge materials to EnCAP Sites would place an undue economic burden on EPIC if it was required to continue to pay the full amount of the Earn Out Consideration due to Longo under Section 1 of the Earn Out Agreement.

65.     In an effort to try and accommodate EPIC's alleged economic concerns, Longo agreed to a temporary and limited reduction of the Earn Out Consideration due to Longo from EPIC under the Earn Out Agreement.  Importantly, Longo did ***not*** agree to reduce any part of the

Earn Out Consideration due to Longo on a permanent basis or with respect to the transportation by EPIC of PVSC-generated sludge materials to sites other than EnCAP Sites in the State of New Jersey and pursuant to the EnCAP Agreement (from approximately $3.42/ton to $2.75/ton).

66.     Accordingly, after the termination of the EnCAP Agreement, which occurred on or before September 30, 2009, EPIC was required to pay Longo all Earn Out Consideration due and owing to Longo under the Earn Out Agreement and at the rates specifically required thereby.

**C.      Resolution Of Alleged Disputes In July 2011**

67.     In July 2011, officers and directors of EPIC, including Mr. Raymond Sittig ("**Sittig**"), then- Vice President of EPIC responsible for the sales and operations of EPIC's rail transportation division, again asked Longo to meet and discuss the continuing obligations of EPIC to Longo under the 1999 Agreements.

68.     Specifically, Sittig and other officers and directors of EPIC (and related entities) once again questioned the obligation of EPIC to pay Longo any amounts on account of the transportation of PVSC-generated sludge materials to any sites outside the Commonwealth of Virginia.

69.     Relying on the plain language in the operative agreements, Longo demanded that EPIC continue to perform its obligations to Longo under the Earn Out Agreement on the terms and conditions therein.  In connection, Longo raised that the same or similar arguments had previously been made by EPIC and resolved in Longo's favor in 2002 and 2004.

70.     Thereafter, EPIC's payments to Longo under the Earn Out Agreement, including, but not limited to, the payment of the PVSC Per Ton Earn Out Consideration with respect to EPIC's transportation of PVSC-generated sludge materials to sites within and without the Commonwealth of Virginia, continued, without interruption, until September 2016.

**D.     2016 Dispute Regarding EPIC's Continuing Obligations In Light Of Fourth PVSC Services Agreement Amendment**

71.     In August and September 2016, various corporate officers of Synagro and EPIC (and related entities), including Mr. Larry Bunting ("**Bunting**"), Controller of EPIC, and Ms. Pamela Racey ("**Racey**"), Vice President of Sales and Development, made representations to Longo that: (a) the PVSC Services Agreement (as amended by the First, Second and Third PVSC Services Agreement Amendments), would, pursuant to its terms, be expiring as of August 31, 2016; (b) Synagro-WCWNJ had entered into a *new* contract with PVSC that was materially different from and in replacement of the PVSC Services Agreement and would commence immediately after the expiration of the PVSC Services Agreement (as amended) on September 1, 2016; and (c) as a result of the foregoing, the last payment that EPIC would be making to Longo under the Earn Out Agreement would be a payment for any Earn Out Consideration due from EPIC to Longo for August 2016.

72.     Based upon information and belief, as well as documents produced to Longo in response to Longo's request in September 2016 to the PVSC under the State of New Jersey's Open Public Records Act, N.J.S.A. 47:1A-1 *et seq.* ("**Longo OPRA Request**"), it became clear to Longo that the representations of Bunting, Racey, and other officers and directors of Synagro (and related entities, including EPIC) with respect to the renewal and extension of the PVSC Services Agreement and EPIC's performance under the Earn Out Agreement were knowingly and materially false when made to Longo and were intended to induce Longo's reliance thereon.

73.     By way of example, on January 29, 2016, Racey submitted, on behalf of Synagro-WCWNJ, a "Sludge Management Service Agreement- Extension Proposal," which states that Synagro-WCWNJ was thereby submitting a "proposal for the ***extension of the existing service agreement*** per your letter request on October 15, 2015." (emphasis included).  It further provides

that it is "predicated upon *a continuation of the current contract* services…" and required an extension of "the current agreement through August 2021, at which time the first of three additional 5-year renewal options would become available...." (emphasis added).

74.     Numerous other documents and information produced pursuant to the Longo OPRA Request made it patently clear that the PVSC Services Agreement was, under the Fourth PVSC Services Agreement Amendment, being extended and amended (not replaced, as misrepresented to Longo), pursuant to Title 40A of New Jersey Statutes Annotated (N.J.S.A. 40A: ll-15) and the New Jersey Wastewater Treatment Privatization Act (N.J.S.A. 58:27-1 et seq.) (together, the "**Applicable New Jersey Statutes**").

75.     Specifically, the Fourth PVSC Services Agreement Amendment provides for the extension of the term of the PVSC Services Agreement for an additional, initial term of five (5) years (*i.e.,* from September 1, 2016 to August 31, 2021), and thereafter, at the PVSC's sole option, for up to three additional terms of five (5) years each.  *See* Exhibit A-4 at p. 2.

76.     The recitals in the Fourth PVSC Services Agreement Amendment, as executed, state that the Applicable New Jersey Statutes permit the PVSC, under certain circumstances and upon a proper showing, to *extend and renew* agreements such as the PVSC Services Agreement for a period not to exceed a total of forty (40) years, inclusive of all existing and future optional extension periods.  *See* Exhibit A-4 at p. 1.

77.     In other words, as long as the PVSC abided by and met all of the requirements attendant with such an extension/renewal request, the PVSC (and its counterparties to any agreement) could avoid having to subject the services agreement to the procurement process delineated in and otherwise required by the Applicable New Jersey Statutes.

78.     In connection with the approval of the renewal and extension of the existing PVSC Services Agreement numerous public records contain statements by both the PVSC and Synagro/EPIC regarding the fact that the PVSC Services Agreement was being renewed and extended rather than, as misrepresented to Longo by Bunting, Racey and other officers and directors of Synagro and/or EPIC, being replaced and superseded by a new agreement.

79.     By way of example, at the monthly meeting of the State of New Jersey Department of Community Affairs Local Finance Board held in Trenton, New Jersey on August 10, 2016, counsel to the PVSC, Mr. James Piro of the law firm Piro, Zinna, Cifelli, Paris & Genitempo, represented to the Local Finance Board that: (i) the PVSC Services Agreement was being extended and renewed under applicable law, and (ii) that there were "few but not really material" changes to the original PVSC Services Agreement.  *See* Official Transcript of August 10, 2016 Meeting at pp. 86-97, a true and correct copy of which is annexed hereto as Exhibit "F".

80.     Accordingly, the representations of Bunting, Racey and other officers and directors of Synagro and/or EPIC to Longo were made with the intent of misleading Longo as to the true state of affairs regarding the status of the PVSC Services Agreement and with the intent of inducing Longo to abandon his demands for the Earn Out Consideration to which he was and is plainly entitled to receive under the Earn Out Agreement and on account of services continuing to be provided by EPIC under and pursuant to the PVSC Services Agreement, as renewed and extended pursuant to the Fourth PVSC Services Agreement Amendment.

81.     In furtherance of EPIC's concerted efforts to mislead Longo regarding his continued entitlement to receive payments of Earn Out Consideration under the Earn Out Agreement, on or about September 15, 2016, EPIC transmitted a check made payable to Longo and bearing the legend "final payment under Earn Out Agreement" ("**September 15 Check**").

82.     After noting the conspicuous legend on the September 15 Check and after reviewing the initial documents and information produced by the PVSC pursuant to the Longo OPRA Request, Longo, by letter dated September 27, 2016, returned the September 15 Check to EPIC and demanded a replacement check without any legend.

83.     Subsequently, on or about October 20, 2016, EPIC re-issued the September 15th Check without the objectionable and false legend originally placed thereon by EPIC (the "**Replacement September 15 Check**").   Longo negotiated the Replacement September 15th Check.

84.     On or about October 21, 2016 ("**October 2016 Letter**"), outside counsel to "Synagro Technologies, Inc., and all affiliates, including Environmental Protection Improvement Company…and Wheelabrator…", Mr. Thomas K. Prevas, of the law firm Saul Ewing LLP, sent correspondence to Longo delineating the alleged reasons why the Earn Out Agreement was no longer enforceable by Longo ("**Prevas Letter**").   A true and correct copy of the Prevas Letter is annexed hereto as Exhibit G.

85.     The Prevas Letter contends, without basis, that:

> Synagro is confident that it owes you no money under the Earn Out Agreement and that it was an oversight to have paid you under this agreement for some years.

*See* Exhibit G at p. 1.

86.     The Prevas Letter blatantly ignores the terms of the 1999 Agreements and the PVSC Services Agreement as well as the more than fifteen (15) year course of performance thereunder. It also threatens, without support or any specificity regarding what payments Synagro believes were wrongly made to Longo by EPIC, to seek to recoup monies properly paid (as represented by the numerous occasions referenced herein above where the parties met and ultimately agreed that

EPIC did owe Longo amounts under the Earn Out Agreement) by EPIC under the Earn Out Agreement.

87.   Additionally, the Prevas Letter willfully ignores the repeated ratification by EPIC of such obligations to Longo as well as EPIC's payment of amounts it *certified* were due and owing to Longo under the Earn Out Agreement.

88.   In fact, the Prevas Letter improperly relies upon substantially the same arguments *raised and ultimately abandoned* by officers and directors of Synagro and/or EPIC, including, among others, Thomas, Sittig, Bunting and Racey, in 2002, 2004 and 2011 – namely, that EPIC is not obligated under the Earn Out Agreement to pay Longo any amounts for PVSC-generated sludge materials transported by EPIC to sites outside the Commonwealth of Virginia.  *See* Exhibit G at p. 2.

89.   The Prevas Letter also alleges that:

> Because the Articles of Agreement and Transportation Agreement are no longer in effect, there is no payment obligation under the Earn Out Agreement – the payment term has ended.

*Id*.  The only support for the foregoing is the naked allegation that after Synagro purchased both EPIC and WCWNJ "[i]n the early 2000s", "they waived all of the terms of the Articles of Agreement and Transportation Agreement and *effectively tore up these agreements*," and that:

> For the avoidance of doubt, effective September 1, 2016, Wheelabrator and EPIC executed a written termination of the Articles of Agreement and the Termination Services Agreement.  Further, to the extent the Earn Out Agreement is terminable at will and not already terminated, Synagro elected to terminate the Earn Out Agreement effective September 1, 2016.

Exhibit G at p. 2 and ftnt. 1.

90.   Such contentions are unfounded in both law and fact and are patently contradicted by the parties' course of dealing and the terms of the relevant agreements, including, without

limitation, those provisions of the 1999 Agreements that plainly provide that no entity can take any action that would materially affect Longo's rights thereunder without first providing Longo prior written notice and obtaining his written consent thereto.  *See*, *supra*, paragraphs 33-36.

**E.     EPIC's Material Misrepresentations And Underpayment Of Amounts Due To Longo**

91.     As previously indicated, from the inception of the Earn Out Agreement through and including August 31, 2016, EPIC paid Longo those amounts ***EPIC alleged*** it owned to Longo under the Earn Out Agreement (with the sole exception of the limited period during which Longo agreed to accept a reduced amount of the PVSC Per Ton Earn Out Consideration due and owing to Longo on account of and relating to EPIC's transportation services relating to the EnCAP Agreement, *see*, *supra*, paragraphs 57-66).

92.     EPIC, however, has refused to pay Longo any amounts due and owing to Longo under the Earn Out Agreement for those periods subsequent to August 2016 and despite the continuing effectiveness and enforceability of the 1999 Agreements and the PVSC Services Agreement.

93.     Additionally, prior to October 2009, EPIC failed to deliver the required Earn Out Statement certified by an appropriate officer of EPIC (as required by Section 3 of the Earn Out Agreement), together with the monthly payments made to Longo.

94.     For the period from October 2009 through August 31, 2016, EPIC: (a) sent Longo an Earn Out Statement (certified by an officer of EPIC), as required by Section 3 of the Earn Out Agreement, and (b) paid Longo those amounts that an "appropriate executive" of EPIC certified as representing the Earn Out Consideration due to Longo under the Earn Out Agreement, also as required by Section 3 of the Earn Out Agreement.

95.     Longo reasonably relied upon the certified Earn Out Statements he received, which certified Earn Out Statements further ratified EPIC's acknowledgements (*e.g.,* in 2002, 2004 and 2011, as generally described in paragraphs 47-90, *supra*) of EPIC's continuing obligations to Longo under the Earn Out Agreements.

96.     Additionally, from October 2009 through August 2016, EPIC commonly provided Longo with the underlying "intercompany" invoices issued by EPIC to Synagro with respect to EPIC's performance under the PVSC Services Agreement.  In each such case, the "Unit Price" charged by EPIC to Synagro plainly included those amounts due and owing to Longo under the Earn Out Agreement and with respect to such services by EPIC, as certified to Longo by officers and directors of EPIC (and related entities).

97.     As a result of the foregoing, although EPIC contends it paid Longo those amounts it alleged were due and owing to Longo under the Earn Out Agreement from October 2009 through August 2016, EPIC actually failed to pay Longo all amounts due under the Earn Out Agreement as a result of, at least, EPIC's failure to: (x) pay the PVSC Per Ton Earn Out Consideration defined in and required by Section 1(a) of the Earn Out Agreement (together with any PVSC Increased Fee required under Section 1(d) of the Earn Out Agreement), on account of any PVSC-generated sludge materials transported by EPIC within or without the Commonwealth of Virginia; (y) pay the Diversion Fee defined in and required by Section 1(b) of the Earn Out Agreement in those circumstances, if any, that WCWNJ elected to transport PVSC-generated sludge materials to sites outside of the Commonwealth of Virginia and such materials are transported by an entity other than EPIC; and/or (z) the Additional Fee defined in and required by Section 1(e) of the Earn Out Agreement in the event that WCWNJ agreed to transport "additional sludge" not provided for

under the PVSC Services Agreement (*i.e.,* transportation and related services added pursuant to modifications of or change orders with respect to the PVSC Services Agreement).

98.     Indeed, as previously indicated, EPIC wrongly continued to pay Longo $2.75/ton for all PVSC-generated sludge materials transported by EPIC to any site within or without the Commonwealth of Virginia from at least October 2009 through and including August 31, 2016 (*i.e.,* the period after which the agreed-upon temporary reduction expired). *See, supra*, paragraphs 57-66.

99.     Based upon the limited information received and reviewed to date, the total additional amount due and owing as of the date hereof, exclusive of interest and costs, by EPIC to Longo under the Earn Out Agreement and as a direct result of misrepresentations by officers, directors and agents of Synagro and related entities (including, but not limited to, EPIC) totals not less than $1.4 million.

100.     Additionally, due to the intentional misrepresentations made to Longo by officers and directors of Synagro and related entities, including EPIC, through August 31, 2016, significant questions exist regarding EPIC's payment of all other amounts due to Longo under the Earn Out Agreement.

**Longo's Delivery To EPIC Of Default Notice Under Earn Out Agreement**

101.     On or about November 3, 2016, Longo served a formal Default Notice via overnight mail on EPIC, as required under Section 8 of the applicable Earn Out Agreement.

102.     No amounts due and owing under the Earn Out Agreement for the periods subsequent to August 31, 2016, have been paid by EPIC to Longo.

103.    Additionally, for the reasons set forth in greater detail herein above, Longo has a good faith basis to believe that, since at least October 2009, Longo has not been paid all amounts due and owing to him under the Earn Out Agreement.

104.    EPIC has no valid basis for its refusal to pay Longo all amounts due and owing to him under the Earn Out Agreement.

105.    Section 17 of the Earn Out Agreement provides that EPIC acknowledges that is shall not assert any "right to withhold, recoup or setoff any monies due to Longo" under the Earn Out Agreement by reason of "any claim, dispute or judgment" that EPIC has or may have against Longo.  Exhibit D at pp. 15-16.

106.    Section 17 of the Earn Out Agreement also provides that EPIC's *sole* means of contesting the enforceability of the Earn Out Agreement and/or any payments to Longo is:

> …to apply to a court of competent jurisdiction within the State of New Jersey to obtain a final order confirming that it need not make such payment; provided, however, that ***before any such application is made or while any such application is pending***, EPIC shall continue to perform its obligations hereunder, including, but not limited to, the obligation to pay each and every installment of Earn Out Consideration to Longo as above provided.   If EPIC shall fail to make any payment of Earn Out Consideration to Longo as provided in this Earn Out Agreement while its application for a final order to prevent such payment is pending, Longo shall have the right to apply for and obtain an immediate injunction requiring EPIC to continue to perform all of its obligations under this Earn Out Agreement while its application for a final order is pending.

*Id*.  (emphasis added).

107.    Moreover, Section 16 of the Earn Out Agreement provides that if EPIC fails to timely pay all or any portion of the Earn Out Consideration due to Longo thereunder, then:

> …such underpayment shall accrue interest at a floating rate per annum equal to the Prime Lending Rate as quoted in the "Wall Street Journal", from time to time, plus two percent. Any interest payable hereunder shall be due and payable at the time any underpayment of Earn Out Consideration is required to be paid.

Exhibit D at p. 15.

### Audit And Accounting Rights

108.    Section 7 of the Earn Out Agreement provides Longo the right to inspect and duplicate the books and records of EPIC, including, but in no way limited to the "…separate accounting records for the Articles of Agreement [and] the Transportation Services Agreement," which, pursuant to Section 4 of the Earn Out Agreement, EPIC was required to maintain "… to facilitate calculation and confirmation of the Earn Out Consideration," due and owing to Mr. Longo thereunder.

109.    Additionally, pursuant to Section 6 of the above-referenced Security Agreement, Longo has the right to inspect and duplicate the books and records of EPIC, including, but in no way limited to those portions thereof pertaining to "…Receivables, and all originals of all chattel paper which evidence Receivables…."

110.    On November 30, 2016, Longo issued a formal demand for access to EPIC's books and records for such purpose.  A true and correct copy of the demand letter is annexed hereto as Exhibit "H".

### COUNT ONE
### (Accounting And Disgorgement)

111.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 110, inclusive, of the Complaint as if set forth verbatim and at length herein.

112.    Under the Earn Out Agreement, Defendant EPIC owes Plaintiff all or a portion of funds received by EPIC from WCWNJ or Synagro-WCWNJ under and on account of the Articles of Agreement and the Transportation Services Agreement, which amounts were to have been held in trust for the sole benefit and immediately turned over to Plaintiff.

113.    The amounts owed to Plaintiff by Defendant EPIC is unknown to Plaintiff, and cannot be ascertained without Defendant EPIC fully complying with its obligations under the Earn Out Agreement and the Security Agreement, as previously demanded by Plaintiff, *see* paragraph 111-112, *supra*, to make its books and records available to Plaintiff for inspection, review and duplication.

114.    Under the Earn Out Agreement and Security Agreement, Defendant EPIC is required to hold and preserve all records concerning receivables under the 1999 Agreements and chattel paper pertaining thereto at its chief place of business (as specified in the Security Agreement) and is required to permit Plaintiff and/or Plaintiff's representatives to inspect, review and duplicate such records.

115.    Therefore, Plaintiff seeks: (a) access to the books and records of EPIC pertaining to, *inter alia*: (i) all amounts paid to or receivables owed to Defendant EPIC under the 1999 Agreements, and (ii) all chattel paper pertaining to all amounts paid to or receivables owed to Defendant EPIC under the 1999 Agreements; and (b) payment of amounts all amounts found to owed by Defendant EPIC to Plaintiff.

## COUNT TWO
### (Breach of Contract)

116.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 115, inclusive, of the Complaint as if set forth verbatim and at length herein.

117.    By way of illustration only and not limitation, the Earn Out Agreement and the Security Agreement constitute valid, binding, and enforceable contracts between Defendant EPIC and Plaintiff.

118.    As reflected and explicitly iterated therein, the Earn Out Agreement and the Security Agreement are supported by valuable consideration and are valid and fully enforceable.

119.    Plaintiff has performed any and all of its obligations under the Earn Out Agreement and the Security Agreement.

120.    Defendant EPIC has knowingly and intentionally failed to make all payments required under the Earn Out Agreement from its inception through and including August 2016, including, but not limited to, those amounts generally described in paragraphs 24-110, *supra*, and therefore has knowingly and intentionally breached the Earn Out Agreement.

121.    Defendant EPIC has knowingly and intentionally refused to make all payments due and owing to Plaintiff under the Earn Out Agreement for each month subsequent to August 2016, and therefore has knowingly and intentionally breached the Earn Out Agreement.

122.    Defendant EPIC has knowingly and intentionally failed to comply with its obligation to timely make all payments due and owing to Plaintiff under the Earn Out Agreement until Defendant EPIC seeks and obtains a final, non-appealable order of a court of competent jurisdiction determining Defendant EPIC's obligations under the Earn Out Agreement and therefore has breached the Earn Out Agreement.

123.    Defendant EPIC has also knowingly and intentionally failed to comply with its obligation to hold all monies received by Defendant EPIC to which Plaintiff is entitled under the Earn Out Agreement in trust for the benefit of Plaintiff and therefore has further breached the Earn Out Agreement.

124.    Defendant EPIC has also knowingly and intentionally failed to comply with its obligation to obtain Plaintiff's prior written consent with respect to any proposed modifications or amendments to any of the 1999 Agreements in advance of taking actions to effect the same and therefore has, by Defendant EPIC's own admissions, further breached the Earn Out Agreement

and Security Agreement by purporting to have taken actions to waive provisions of or willfully and maliciously terminate any or all of the 1999 Agreements.

125.     Plaintiff has, at all relevant times, performed any and all of his contractual duties.

126.     As a direct result of Defendant EPIC's actions, inactions and/or conduct, Plaintiff has been caused to suffer and in the future, will continue to suffer financial loss, damage and irreparable harm.

## COUNT TWO
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

127.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 126, inclusive, of the Complaint as if set forth verbatim and at length herein.

128.     It is implied or understood that each party to a contract must act in good faith and deal fairly with the other party in performing the terms of a contract.

129.     Plaintiff, therefore, had a right to expect that Defendant EPIC would operate its businesses in a manner that was not entirely self-serving and designed to injure the rights of Plaintiff to receive his contractual benefits under the Earn Out Agreement and the Security Agreement.

130.     Defendant EPIC breached the implied covenant of good faith and fair dealing by intentionally and repeatedly interposing unwarranted challenges to Plaintiff's rights under the Earn Out Agreement and intentionally failing to pay Plaintiff all amounts due thereunder.

131.     Defendant EPIC further breached the implied covenant of good faith and fair dealing by failing to segregate and/or hold, for the sole benefit of Plaintiff, in trust all funds due and owing to Plaintiff and received by Defendant EPIC.

132.     Defendant EPIC also knowingly and intentionally breached the implied covenant of good faith and fair dealing by failing to seek and/or obtain Plaintiff's prior written consent with

respect to any proposed modifications or amendments to any of the 1999 Agreements in advance of taking actions to purportedly effect such modifications or amended.

133.    By Defendant EPIC's actions, inactions and/or conduct, Defendant EPIC has breached the implied covenant of good faith and fair dealing that it at all times owed Plaintiff in connection with the effectuation of the Earn Out Agreement.

134.    As a direct and proximate result of the actions, inactions and/or conduct of Defendant EPIC, Plaintiff has been caused to suffer and in the future, will continue to suffer financial loss, damage and irreparable harm.

## COUNT THREE
### (Conversion And Misappropriation)

135.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 134, inclusive, of the Complaint as if set forth verbatim and at length herein.

136.    Section 1(f) of the Earn Out Agreement requires that Defendant EPIC hold all amounts received by Defendant EPIC to which Plaintiff is entitled under the Earn Out Agreement in trust for the sole benefit of Plaintiff.

137.    Section 1(f) of the Earn Out Agreement further requires that all amounts received by Defendant EPIC to which Plaintiff is entitled under the Earn Out Agreement be segregated from other funds of Defendant EPIC and delivered to Plaintiff.

138.    Section 3 of the Earn Out Agreement obligates Defendant EPIC to make all payments due and owing to Plaintiff thereunder no less frequently than monthly and on or before the date that is ten (10) days after the end of each calendar month.

139.    Plaintiff has demanded the payment of all amounts due and owing to Plaintiff under the Earn Out Agreement from Defendant EPIC.

140.    Defendant EPIC has improperly refused to pay Plaintiff the money to which Plaintiff is entitled under the Earn Out Agreement.

141.    Defendant EPIC has failed to demonstrate that it is or has ever held all amounts due to Plaintiff under the Earn Out Agreement in a separate account solely for the benefit of Plaintiff.

142.    As a direct and proximate result of the actions, inactions and/or conduct of Defendant EPIC, Plaintiff has been caused to suffer and in the future, will continue to suffer financial loss, damage and irreparable harm.

**COUNT FOUR**
**(Unjust Enrichment)**

143.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 142, inclusive, of the Complaint as if set forth verbatim and at length herein.

144.    As a direct and proximate result of the actions, inactions and/or conduct of Defendant EPIC, including, but not limited to, the receipt, retention and use of monies that, under the Earn Out Agreement, were received by EPIC in trust and solely for the benefit of Plaintiff, Defendant EPIC has been unjustly enriched at the expense of Plaintiff and to his detriment.

145.    As a direct and proximate result of the actions, inactions and/or conduct of Defendant EPIC, Plaintiff has been caused to suffer and in the future, will continue to suffer financial loss, damage and irreparable

**COUNT FIVE**
**(Malicious and Tortious Interference With Prospective Economic Advantage)**

146.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 145, inclusive, of the Complaint as if set forth verbatim and at length herein.

147.    The interference by Defendant EPIC with Plaintiff's rights, entitlements and benefits under the Earn Out Agreement and the Security Agreement, was knowing and malicious

36

and was motivated solely for the purpose of intentionally and tortuously depriving Plaintiff of his justifiable and reasonable expectations of realizing the same thereunder, including, but not limited to, the timely receipt of compensation to Plaintiff as memorialized in the Earn Out Agreement and Security Agreement.

148.    Plaintiff has been directly and proximately, substantially, economically and financially injured as a result of the malicious and tortious interference by Defendant EPIC with his rights, entitlements and interest in and under the Earn Out Agreement and the Security Agreement.

### COUNT SIX
### (Negligent Misrepresentation)

149.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 148, inclusive, of the Complaint as if set forth verbatim and at length herein.

150.    The false, inaccurate and/or misleading representations of material fact made in connection with Defendant EPIC's continuing enforceability of and performance under the 1999 Agreements, including the Earn Out Agreement and the Security Agreement, were made negligently by Defendant EPIC and its agents.

151.    Plaintiff reasonably and in good faith relied upon the materially false and misleading representations and other non-disclosures and/or omissions of material fact made by Defendant EPIC and Defendant EPIC's agents in connection with Defendant EPIC's performance or non-performance under the Earn Out Agreement and the Security Agreement, and thereafter, Plaintiff's enforcement of his rights under the Earn Out Agreement and the Security Agreement.

152.    Defendant EPIC and its agents knew or should have known of these materially false and misleading representations and other non-disclosures and/or omissions of material fact.

153.    Alternatively, the representations made by Defendant EPIC and its agents were made recklessly.

154.    As a direct and proximate result of the actions, inactions and/or conduct of Defendant EPIC and its agents, Plaintiff has been caused to suffer and in the future, will continue to suffer financial loss, damage and irreparable harm.

## COUNT SEVEN
### (Declaratory Relief)

155.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 154, inclusive, of the Complaint as if set forth verbatim and at length herein.

156.    An actual and justiciable controversy has arisen and now exists between the parties concerning the continuing enforceability of the 1999 Agreements and, in particular, their respective rights and obligations under the Earn Out Agreement and the Security Agreement, including, but not limited to, the obligation of Defendant EPIC to continue to perform under the Earn Out Agreement and the Security Agreement throughout the remainder of the term of the PVSC Services Agreement, which was most recently renewed and extended pursuant to the Fourth PVSC Services Agreement Amendment.

157.    Plaintiff seeks a judicial determination of his rights, obligations and entitlements arising under the Earn Out Agreement and the Security Agreement, including, but not limited to, his immediate entitlement to all Earn Out Consideration due and owing to Plaintiff under the Earn Out Agreement.

## COUNT EIGHT
### (Indemnity)

158.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 157, inclusive, of the Complaint as if set forth verbatim at length herein.

159.    Pursuant to the Earn Out Agreement and the Security Agreement, Defendant EPIC expressly agreed to indemnify and hold harmless the Plaintiff pursuant to Sections 12(a) and (b) of the Security Agreement, *see* paragraphs 38-40, above.

160.    As described above, Defendant EPIC has breached the Earn Out Agreement and Security Agreement and failed to comply with its obligations thereunder.

**COUNT EIGHT**
**(Foreclosure)**

161.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 160, inclusive, of the Complaint as if set forth verbatim and at length herein.

162.    By reason of the defaults of Defendant EPIC under the Earn Out Agreement and pursuant to the terms and conditions of the Security Agreement and applicable law, Plaintiff is entitled to immediate possession of the Collateral and to immediately enforce Plaintiff's rights with respect to the Collateral as delineated therein and under applicable law.

**COUNT NINE**
**(Mandatory Injunctive Relief)**

163.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 162, inclusive, of the Complaint as if set forth verbatim and at length herein.

164.    Defendant EPIC is contractually obligated to segregate and hold in trust, for the sole benefit of Plaintiff, all amounts received by EPIC to which Plaintiff is entitled under the Earn Out Agreement.

165.    Defendant EPIC is contractually obligated to deliver to Plaintiff all amounts received in trust for the sole benefit of Plaintiff by Defendant EPIC under the Earn Out Agreement.

166.    Defendant EPIC is contractually obligated to continue to pay all amounts due and owing to Plaintiff under the Earn Out Agreement unless and until Defendant EPIC seeks and obtains a final, non-appealable order from a court of competent jurisdiction to the contrary.

167.    Defendant EPIC has failed to: (a) segregate from other funds of Defendant EPIC those amounts received by Defendant EPIC to which Plaintiff is entitled under the Earn Out Agreement; (b) hold amounts received by Defendant EPIC to which Plaintiff is entitled under the Earn Out Agreement in trust for the benefit of Plaintiff; and (c) timely deliver amounts received by Defendant EPIC to which Plaintiff is entitled under the Earn Out Agreement to Plaintiff unless and until Defendant EPIC obtains a final, non-appealable order from a court of competent jurisdiction determining any and all amounts due and owing to Plaintiff under the Earn Out Agreement are not, in fact, due and owing.

168.    Pursuant to the Security Agreement, Defendant EPIC is contractually obligated to maintain the Collateral for the benefit of Plaintiff and to ensure that Plaintiff at all times holds a first priority security interest in such Collateral.

169.    Defendant EPIC is contractually obligated to refrain from agreeing to material amendments to and/or the termination of some or all of the 1999 Agreements without the prior written consent of Plaintiff with respect to the same.

170.    Defendant EPIC contends that the 1999 Agreements have been terminated and are not in force and effect despite having failed to seek the required prior written consent with respect thereto from Plaintiff and/or providing any documents or information reflecting the same.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant EPIC as follows:

(1)    Ordering Defendant EPIC to immediately provide Plaintiff access to Defendant EPIC's books and records for purposes of reviewing, inspecting and duplicating such portions thereof that pertain to, *inter alia*: (i) all amounts paid to or receivables owed to Defendant EPIC under the 1999 Agreements, and (ii) all chattel paper relating to all receivables paid or to be paid to Defendant EPIC under any of the 1999 Agreements;

(2)    Ordering Defendant EPIC to immediately disgorge to Plaintiff all amounts found to be due and owing by Defendant EPIC to Plaintiff under the 1999 Agreements;

(2)    Declaring the 1999 Agreements and the PVSC Services Agreement to be in full force and effect and therefore enforceable, to the extent applicable, by Plaintiff as against Defendant EPIC;

(3)    Awarding Plaintiff damages in an amount to be proven at trial, together with pre- and post-judgment interest, on account of Defendant EPIC's: (w) breaches of the Earn Out Agreement and Security Agreement, (x) breaches of the implied covenant of good faith and fair dealing with respect to the Earn Out Agreement and Security Agreement, (y) conversion and misappropriation of and/or unjust enrichment with respect to those amounts received by Defendant EPIC that were to be segregated and held in trust for the sole benefit of Plaintiff under the terms and conditions of the Earn Out Agreement and the Security Agreement; and/or (z) negligent misrepresentations and other non-disclosures and/or omissions of material fact with respect to the enforceability of and/or amounts due to Plaintiff under the Earn Out Agreement and Security Agreement;

(4)     Holding that Plaintiff is entitled to, as an initial matter, a preliminary mandatory injunction and, as a final matter, a permanent mandatory injunction requiring Defendant EPIC to:

a.     Immediately transmit to Plaintiff all of all amounts presently due and owing and to timely make the payment of all amounts that may in the future become due and owing to Plaintiff under the Earn Out Agreement;

b.     Refrain from commingling any funds to which Plaintiff is entitled under the Earn Out Agreement with any other funds of Defendant EPIC or otherwise failing to take all actions necessary to ensure that all such amounts are held in trust for the sole benefit of Plaintiff;

c.     Refrain from taking any action that may impact Plaintiff's rights to realize upon the Collateral now or in the future, as the Court may direct; and

d.     Refrain from contending that any of the 1999 Agreements have been materially modified or terminated and, therefore, are not fully enforceable.

(5)     Finding Defendant EPIC liable to Plaintiff for the payment of all amounts required to be paid by Defendant EPIC to Plaintiff on account of the indemnification provisions in the Security Agreement, including for all costs and disbursements related to this action;

(6)     Holding that Plaintiff is entitled to immediately foreclose on its first priority security interest in the Collateral in accordance with the procedures provided for in the Security Agreement; and

(7)     Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all of its claims that permit trial by jury.

Dated:  December 9, 2016

**OKIN HOLLANDER LLC**

500 Frank W. Burr Blvd.
Glenpointe Centre West, 2nd Floor
Teaneck, New Jersey 07666
T: (201) 947-7500

By: s/ Margreta M. Morgulas
 Margreta M. Morgulas (MM7441)
 mmorgulas@okinhollander.com

Attorneys for Plaintiff Robert J. Longo

## CERTIFICATION

Pursuant to L. Civ. R. 112, I hereby certify that the matter in controversy is not the subject matter of any other action or arbitration or administrative proceeding, now or contemplated.

Dated:  December 9, 2016

**OKIN HOLLANDER LLC**

500 Frank W. Burr Blvd.
Glenpointe Centre West, 2nd Floor
Teaneck, New Jersey 07666
T: (201) 947-7500

By: s/ Margreta M. Morgulas
 Margreta M. Morgulas (MM7441)
 mmorgulas@okinhollander.com

Attorneys for Plaintiff Robert J. Longo

43